JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RON MOLINA, individually and on behalf of all others similarly situated, | ) ) ) | CASE NO. CV 08-04796 MMM (FMx) |
| Plaintiff | ) ) | |
| vs. | ) ) ) | ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES |
| LEXMARK INTERNATIONAL, INC., a corporation, and Does One through Twenty-Five, Inclusive, | ) ) ) ) | |
| Defendants. | ) ) ) ) ) ) ) ) | |

Ron Molina filed this class action against his former employer, Lexmark International ("Lexmark"), in Los Angeles Superior Court on August 31, 2005.  He filed an amended complaint alleging claims under California Labor Code §§ 203, 218.5, and 1194 and California Business and Professions Code §§ 17200-17208 in June 2006.  On July 22, 2008, two weeks

before trial, Lexmark removed the case to federal court.[1]  Lexmark asserts that the court has jurisdiction under the Class Action Fairness Act ("CAFA").  See 28 U.S.C. § 1332(d) (granting district courts original jurisdiction over any civil action in which the amount in controversy exceeds \$5,000,000, and, *inter alia*, "any member of a class of plaintiffs is a citizen of a State different from any defendant").  Lexmark contends that it first became aware "with any certainty" that the amount in controversy exceeded \$5,000,000 on July 7, 2008, when it received a summary of damages prepared by Molina's expert witness.[2]  On August 21, 2008, Molina filed a motion to remand, arguing that Lexmark knew the amount in controversy exceeded \$5,000,000 long before its July 22, 2008 removal.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Facts Underlying the Case

Molina alleges that Lexmark has failed to pay its current and former California employees promised vacation and personal day pay.[3]  Lexmark allows its employees to take two to five weeks of paid vacation a year, depending on length of employment, and four to five paid personal days.[4]  Molina asserts that Lexmark has willfully and deliberately maintained a "use it or lose it" policy governing vacation and personal days in violation of California law.   Molina alleges claims under California Labor Code §§ 203, 218.5, and 1194, which seek unpaid vacation wages, unpaid personal day wages, interest, penalties, injunctive and other equitable relief, attorneys' fees, and costs.  He also pleads claims under California Business and Professions Code §§ 17200-17208, which seek injunctive relief, restitution, disgorgement of profits generated by the alleged

---

[1]Plaintiff's Memorandum of Points & Authorities in Support of Motion for Remand ("Mot. Remand") at 5.

[2]Defendant's Memorandum of Points & Authorities in Support of Opposition to Motion for Remand ("Opposition") at 1.

[3]Modified First Amended Complaint ("Am. Comp."), ¶¶ 11-13.

[4]*Id.*, ¶¶ 11-12.  A "use it or lose it" policy is one in which unused vacation or personal days are neither paid at the end of the calendar year nor rolled over to the next year.  (*Id.*)

1    violations, attorneys' fees, and costs.[5]

2        **B.    Procedural History**

3            **1.    The Initial Complaint**

4        Molina filed his initial complaint in Los Angeles Superior Court on August 31, 2005.[6]   The

5    complaint sought unpaid wages for accrued vacation pay only; it did not include allegations related

6    to pay for accrued personal days.[7]   The complaint sought certification of a class composed of all

7    former, current, and future Lexmark employees in California  who were not paid the full amount

8    of vacation pay owed them during a period beginning four years prior to the filing of the

9    complaint.[8]   It did not quantify the amount of damages sought.

10            **2.    The May 2, 2006 Mediation**

11        On May 2, 2006, the parties participated in a mediation conducted by Mark Rudy.

12   Attorneys Sheila Thomas, Kendra Tanacea, and Antonio Lawson were present on behalf of

13   Molina.[9]   Attorneys Frank Liberatore, Robert J. Patton, and Joanie McGuire, as well as Lexmark

14   "Human Resources Generalist," Rebecca Cox, represented defendant.[10]   The parties have different

15   recollections of what transpired at the mediation.

16        Prior to the mediation, Lexmark gave Molina salary information for 111 employees that it

17   had employed from 2001 through early 2006.[11]   Molina's experts "conduct[ed] analysis of potential

18   damages" using this data.[12]   Molina contends that during the mediation, his counsel gave Lexmark

19   _____

20        [5]*Id.* at 10-18.

21        [6]Complaint.

22        [7]*Id.* at 8-12.

23        [8]*Id.*, ¶ 15.

24
25        [9]Declaration of Antonio Lawson ("Lawson Decl."), ¶ 2.

26        [10]Declaration of Frank Liberatore ("Liberatore Decl."), ¶ 4.

27        [11]Declaration of Sheila Y. Thomas ("Thomas Decl."), ¶ 3.

28        [12]*Id.*, ¶ 4.

1  attorney Frank Liberatore a copy of the damages analysis prepared by the consultants.[13]  Molina

2  asserts that the attorneys then returned to separate conference rooms, and mediator Mark Rudy

3  shuttled between them.[14]   Eventually, Liberatore came to see Molina's attorneys, carrying the

4  damage analysis with him.[15]   Liberatore said that the analysis contained an error.[16]   (None of

5  Molina's attorneys can recall the nature of the error;[17] Lawson characterizes it as "minor,"

6  however.)[18]  Thomas contacted the expert and asked him to correct the error.[19]  The expert faxed

7  a corrected analysis, which "resulted in a minimal reduction in the overall damages calculation,"

8  to Rudy.[20]   Rudy took the fax to Liberatore.[21]   The expert faxed a copy of the new analysis to

9  Thomas two days after the mediation.[22]

10        Lexmark asserts that Molina's lawyers never shared the damages analysis with its

11  representatives during the mediation.[23]  It states that its own calculation of potential damages prior

12  to the mediation estimated potential damages at approximately $1,200,000.[24]

13

14  _____

15        [13]*Id.*, ¶ 5; Lawson Decl., ¶ 2.

16        [14]*Id.*.

17        [15]*Id.*

18        [16]*Id.*

19        [17]*Id.*

20        [18]Lawson Decl., ¶ 2.

21        

22        [19]*Id.*, Supplemental Declaration of Sheila Y. Thomas ("Thomas Supp. Decl."), ¶ 3.

23        [20]Lawson Decl., ¶ 3.

24        [21]*Id.*

25        [22]Thomas Supp. Decl., ¶ 3.

26        [23]Liberatore Decl., Declaration of Rebecca Cox ("Cox Decl."). Declaration of Robert J.

27  Patton ("Patton Decl.").

28        [24]Cox Decl., ¶ 11.

4

The documents at the center of this factual dispute[25] consist of a series of charts with columns showing calculations of vacation pay,[26] statutory waiting penalties,[27] and interest[28] allegedly owed to 62 former and 49 current Lexmark employees.

The analysis reflects a total of $1,292,092 in vacation pay, $429,144 in waiting penalties, and $377,840 in interest owed to the 62 former employees, or a total of $2,099,076.[29]  It reflects vacation pay of $2,367,195 and penalties of $924,350, or a total of $3,291,545, owed to the 49 current employees.  On its face, therefore, the damages analysis reveals an amount in controversy, "exclusive of interests and costs," of $5,012,781.[30]  See 28 U.S.C. § 1332(d)(2) (the $5 million amount in controversy minimum under CAFA is "exclusive of interests and costs").

---

[25]Thomas Decl., Ex. 1, 2, 3.

[26]Vacation pay owed to former employees was calculated as follows: (Total Vacation Days Accrued If No Vacation Taken - Vacation Days Taken) x Value Of One Vacation Day.  (Thomas Decl., Ex. 1, 3.)  The calculation assumes that current employees had used none of their vacation days.  (*Id.*, Ex. 2.)  Thus, "Vacation Days Taken" was always zero.

[27]Waiting penalties for former employees were calculated by multiplying the value of one vacation day by 30.  (Thomas Decl., Ex. 1, 2.)  See CAL. LABOR CODE § 203 ("If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days").  The calculation of waiting penalties for current employees is explained in the damages analysis as follows: "Penalty is $50 for 1st pay period, and $100 for subsequent pay periods."  (*Id.*, Ex. 2.)  The court is unable to determine the rationale behind this formula, as none of the applicable statutes provide for a waiting penalty of this type.

[28]Interest was calculated at 10% per year beginning on the last day of employment for former employees.  (Thomas Decl., Ex. 1, 3.)  The analysis did not include interest for current employees.  (*Id.*, Ex. 2.)

[29]Thomas Decl., Ex. 3.

[30]Molina argues that the damages analysis shows that the amount in controversy as of the date of the mediation was $4.09 million.  This figure excludes waiting penalties for current employees from the total amount.  (Thomas Decl., ¶¶ 4-5.)

### 3.     The Amended Complaint, Class Certification and Removal

On June 6, 2006, Molina sought leave to amend his complaint.[31]  The proposed amended complaint added allegations regarding Lexmark's failure to pay employees for accrued personal days.[32]  It also sought to expand the definition of the proposed class in two significant ways: (1) the proposed new class included employees who were not paid for personal days; and (2) it alleged that the class period commenced in 1991 rather than 2001.[33]  The proposed complaint also added a request for punitive damages.[34]

The Superior Court approved Molina's request to file an amended complaint on June 29, 2006.[35]  Thereafter, Lexmark moved to strike references to current and future employees from the complaint; the court struck references to future employees.[36]  Molina filed a modified first amended complaint on October 2, 2006,[37] and the state court certified a class on June 20, 2007.[38]  The class that was certified differed from the class defined in the June 2006 proposed amended complaint only in that it did not include future employees.[39]

The court set trial for May 20, 2008.[40]  At Lexmark's request, this date was later continued

---

[31]Thomas Decl., ¶ 7.

[32]Amended Complaint (attached to Plaintiff's Motion for Leave to File Amended Complaint), ¶ 12.

[33]*Id.*, ¶ 16

[34]*Id.*, ¶ 54.

[35]Thomas Decl., ¶ 7.

[36]*Id.*

[37]*Id.*

[38]*Id.*, ¶ 8.

[39]Am. Comp., ¶ 16.

[40]Remand at 5.

to August 8, 2008.[41]  On July 22, 2008, Lexmark removed the case to federal court,[42] arguing that there is federal jurisdiction under the Class Action Fairness Act.  See 28 U.S.C. § 1332(d) (granting the district courts original jurisdiction over any civil action in which the amount in controversy exceeds $5,000,000, and, *inter alia*, "any member of a class of plaintiffs is a citizen of a State different from any defendant").  The notice of removal asserts that Lexmark first became aware "with any certainty" that the amount in controversy exceeded $5,000,000 on July 7, 2008, when it received a Summary of Damages prepared by Molina's expert witness.[43]  On August 21, 2008, Molina filed a motion to remand, arguing that Lexmark knew that the amount in controversy exceeded $5,000,000 long before July 22, 2008.

## II.  DISCUSSION

### A.    Standard Governing Removal to Federal Court Under CAFA

Unless expressly excepted by some other federal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  Under CAFA, federal courts have subject matter jurisdiction to hear class actions in which the citizenship of the defendant and at least one member of the plaintiff class is diverse, and the amount in controversy exceeds $5,000,000. See 28 U.S.C. § 1332(d).  "According to the Report of the Senate Committee on the Judiciary on CAFA, the requirement under CAFA that the amount in controversy exceed $5 million in the aggregate may be established 'either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief).'"  *Rippee v. Boston Market Corp.*, 408 F.Supp.2d 982, 984 (S.D. Cal. 2005) (quoting S. Comm. on the Judiciary, Class Action Fairness Act of 2005, S.Rep. No.

---

[41]*Id.*

[42]*Id.*

[43]Notice of Removal at 5.

7

1  109-14, at 40 (Feb. 28, 2005), reprinted in 2005 U.S.C.C.A.N. 3, 2005 WL 627977).

2       The Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction."

3  *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (citing *Boggs v. Lewis*, 863 F.2d 662, 663

4  (9th Cir. 1988), and *Takeda v. Northwestern Nat'l Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir.

5  1985)). "The 'strong presumption' against removal jurisdiction means that the defendant always

6  has the burden of establishing that removal is proper." *Id.* (citing *Nishimoto v.*

7  *Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n. 3 (9th Cir. 1990), and *Emrich v. Touche*

8  *Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988)); *Befitel v. Global Horizons, Inc.*, 461

9  F.Supp.2d 1218, 1221 (D. Haw. 2006) ("In diversity cases, the burden of proving all jurisdictional

10  facts rests on the party seeking jurisdiction," citing *Kanter v. Warner-Lambert Co.*, 265 F.3d 853,

11  857-58 (9th Cir. 2001)).

12       If there is any doubt regarding the existence of federal jurisdiction, the court must resolve

13  those doubts in favor of remanding the action to state court. *Gaus*, 980 F.2d at 566 ("[f]ederal

14  jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance,"

15  citing *Libhard v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979)); *Befitel*, 461

16  F.Supp.2d at 1221 ("Diversity jurisdiction is to be strictly construed and any doubts are to be

17  resolved in favor of remand to the state court" (citations omitted)).  This is true even where CAFA

18  provides the basis for removal. *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685 (9th

19  Cir. 2006) ("under CAFA the burden of establishing removal jurisdiction remains, as before, on

20  the proponent of federal jurisdiction").

21      **B.**    **The Thirty Day Window for Removal**

22       28 U.S.C. § 1446(b) governs the timing of removal.  It provides that a defendant has thirty

23  days to file a notice of removal once it learns that an action is removable. See 28 U.S.C. §1446(b).

24  This thirty day period begins to run "'from defendant's receipt of the initial pleading only when

25  that pleading affirmatively reveals on its face' the facts necessary for federal court jurisdiction."

26  *Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 690-91 (9th Cir. 2005) (quoting *Chapman v.*

27  *Powermatic, Inc.*, 969 F.2d 160, 163 (5th Cir.1992), and citing *Lovern v. Gen. Motors Corp.*, 121

28  F.3d 160, 162 (4th Cir. 1997) ("[W]e will allow the court to rely on the face of the initial pleading

1   and on the documents exchanged in the case by the parties to determine when the defendant had

2   notice of the grounds for removal, requiring that those grounds be apparent within the four corners

3   of the initial pleading or subsequent paper")).

4          If the amount in controversy is not clear on the face of the initial pleading, however, the

5   thirty-day period for removal does not "begin ticking until a defendant receives 'a copy of an

6   amended pleading, motion, order or other paper' from which it can determine that the case is

7   removable." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (quoting

8   28 U.S.C. §1446(b)).  By focusing on the objective facts contained in documents exchanged by the

9   parties, this bright-line rule aims to bring "bring certainty and predictability to the process and

10  avoids gamesmanship in pleading" on the part of the plaintiff.  *Harris*, 425 F.3d at 697.

11         A document reflecting a settlement demand in excess of the jurisdictional minimum

12  constitutes "other paper" sufficient to provide notice that a case is removable and starts the thirty

13  day window under § 1446(b). *Babasa v. Lenscrafters, Inc.*, 498 F.3d 972, 974-75 (9th Cir. 2007)

14  (citing *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) ("[a] settlement letter is relevant

15  evidence of the amount in controversy if it appears to reflect a reasonable estimate of the plaintiff's

16  claim"); *Ambriz v. Luxury Imports of Sacramento Inc.,* No.C08-01004 JSW, 2008 WL 1994880,

17  *2 (N.D. Cal. May 5, 2008) ("Because Chase failed to remove this action within thirty days of

18  receiving the settlement demand letter, Chase's removal was untimely"); *Krajca v. Southland

19  Corp.*, 206 F. Supp. 2d 1079, 1081-82 (D. Nev. 2002) ("[T]he Ninth Circuit decision in *Cohn v.

20  Petsmart, Inc.* clarified the law with respect to the use of settlement letters as probative of the

21  amount in controversy"); *Del Real v. Healthsouth Corp.*, 171 F.Supp.2d 1041, 1043 (D. Ariz.

22  2001) ("[A]s to whether a demand letter is admissible as evidence, many courts have ruled that

23  even if the initial pleading in a case does not support the amount in controversy requirement for

24  diversity jurisdiction, defendants may use a variety of documents, including a written settlement

25  demand, as 'other paper,' to determine if the case is removable").  See also *Chase v. Shop 'N Save

26  Warehouse Foods, Inc.*, 110 F.3d 424, 428-30 (7th Cir. 1997) ("Chase has asserted the value of

27  her claim by making a settlement offer for over twice the jurisdictional amount, by refusing Shop

28  'N Save's request to admit that she would not seek more than $50,000 in damages, and by

1  specifically alleging a laundry list of serious and disabling injuries that will result in present and

2  future damages"); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1097 (11th Cir. 1994) ("Plaintiff . . .

3  has offered to settle the case for $45,000.  While this settlement offer, by itself, may not be

4  determinative, it counts for something.  Defendant also offered no proof that plaintiff's prayer is

5  grossly inconsistent with her alleged damages"); *Wilson v. Belin*, 20 F.3d 644, 651 n. 8 (5th Cir.

6  1994) ("Because the record contains a letter, which plaintiff's counsel sent to defendants stating

7  that the amount in controversy exceeded $50,000, it is 'apparent' that removal was proper").  A

8  plaintiff's damage estimate will not establish the amount in controversy, however, if it appears to

9  be only a "bold optimistic prediction." *Surber v. Reliance Nat'l Indem. Co.*, 110 F.Supp.2d 1227,

10  1232 (N.D. Cal. 2000).

11       If a defendant fails to comply with the procedural requirements of § 1446(b), the proper

12  procedural vehicle for challenging the removal is a motion to remand.  See 28 U.S.C. § 1447(c);

13  *Ultra Tool & Plastics, Inc. v. Schulman*, No. 98-CV-0473E(SC), 1998 WL 864896, *1

14  (W.D.N.Y. Decl. 2, 1998).  Once a motion to remand is filed, the party who removed the case has

15  the burden of establishing that federal jurisdiction is proper.  See *Gaus*, 980 F.2d at 566-67;

16  *Emrich*, 846 F.2d at 1195 (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)).

17  See also *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 403-04 (9th Cir. 1996) (when

18  removing a case to federal court, defendants bear the burden of proving, by a preponderance of

19  the evidence, actual facts sufficient to support jurisdiction); *Olsen v. Foundation Health Plan*, No.

20  C 99-1804 THE, 1999 WL 390842, *2 (N.D. Cal. June 11, 1999) (if a plaintiff challenges the

21  removal, defendant "bears the burden of establishing [its] propriety. . . ," citing *Gaus*, 980 F.2d

22  at 566).

23       The removal statute is strictly construed against removal, and all doubts respecting

24  jurisdiction are resolved in favor of remand.  *Gaus*, 980 F.2d at 566; *Libhart*, 592 F.2d at 1064.

25  **C.    The Parties' Arguments**

26       The parties do not dispute that the amount in controversy in this case exceeds $5 million or

27

28

that the case meets CAFA's diversity requirements.[44]   They dispute, however, when Lexmark first received "an amended pleading, motion, order or other paper" from which it could ascertain that the amount in controversy exceeded CAFA's $5 million threshold.  See  28 U.S.C. § 1446(b). Lexmark contends that it was unable to ascertain the amount in controversy until its receipt of Molina's expert report regarding damages on July 7, 2008.[45]   Because it removed within thirty days of its receipt of the report, Lexmark contends, its removal was timely.  See id.

Molina counters that the removal was untimely for three reasons.  He asserts that settlement negotiations, which continued after the May 2, 2006 mediation, put Lexmark on notice of the amount in controversy.[46]  As evidence of this, Molina cites two letters from mediator Mark Rudy to Molina's counsel, dated April 17 and 18, 2007.[47]   In the letters, Rudy states that he told Lexmark's counsel of Molina's position that settling the case would require $8-10 million.[48]

Molina also asserts that Lexmark had the ability to calculate the amount in controversy based on employee data in its possession.  He argues that (1) Lexmark learned the "formula" used to calculate the original $4.09 million damages number during the May 2, 2006 mediation, and could have applied the same formula to its records to determine the amount in controversy under the amended complaint; and (2) that the "formula" was "obvious, based on the nature of plaintiff's unpaid-vacation and wait-penalty claims," such that Lexmark could have calculated the amount in controversy even absent the alleged disclosure during mediation.[49]

---

[44]Although parties may not confer subject matter jurisdiction on a federal court by consent, the court is satisfied that the amount in controversy requirement is met.  See, e.g., *Gosa v. Mayden*, 413 U.S. 665, 707 (1973) ("One of the most basic principles of our jurisprudence is that subject-matter jurisdiction cannot be conferred upon a court by consent of the parties") (Marshall, J., dissenting). CAFA's diversity requirements are met as well.  (Notice of Removal, ¶ 16.)

[45]Notice of Removal at 5.

[46]Reply in Support of Motion to Remand ("Reply") at 1.

[47]Thomas Supp. Decl., ¶ 5.

[48]*Id.*, Ex. B, C.

[49]*Id.* at 9.

1    Finally, Molina argues that Lexmark could have ascertained that the amount in controversy

2    exceeded $5,000,000 on June 6, 2006, when Molina sought leave to file an amended complaint.[50]

3    He asserts that, during the May 2, 2006 mediation, Lexmark learned that the amount originally in

4    controversy was $4.09 million,[51] and that it could have used this knowledge, coupled with the

5    expanded class period alleged in the amended complaint, to ascertain that the amount in

6    controversy exceeded $5 million.[52]   Molina also argues that the additional claims for unpaid

7    personal days and punitive damages included in the amended complaint provided further evidence

8    that the amount in controversy had increased to more than $5,000,000.[53]

9    Lexmark denies receiving any notice of the amount in controversy on which it could act

10   before its receipt of the July 7, 2008 expert report.[54]  As noted, it disputes receiving a copy of the

11   damages analysis prepared by Molina's expert during the mediation.  Lexmark asserts, however,

12   that even if it had, the federal common law mediation privilege articulated in *Folb v. Motion*

13   *Picture Industry Pension & Health Plans*, 16 F.Supp.2d 1164 (C.D. Cal. 1998), prohibits use of

14   information exchanged during mediation for any purpose.[55]  See *id.* at 1180-81.  Alternately, it

15   argues that state privilege law applies because jurisdiction under CAFA is based on diversity.[56]

16   Consequently, Lexmark asserts, Molina cannot rely on information purportedly exchanged during

17   the mediation to demonstrate that its removal of the action was untimely.

18

19

20   _____

21   [50]Remand at 1-4.

22   [51]*Id.* at 1-3.

23   [52]*Id.* at 4.

24   [53]*Id.*

25

26   [54]Notice of Removal at 5; Opposition at 2.

27   [55]Opposition at 9.

28   [56]*Id.* at 9-10.

1

2    **1.**  **Whether Information Exchanged During Mediation Can Establish the**

3       **Amount in Controversy**

4     **a.**  **Whether State or Federal Privilege Law Applies**

5   Although Lexmark relies primarily on the federal common law mediation privilege

6 recognized in *Folb*, it also suggests that the court should apply California privilege law because the

7 case is one in which state law provides the rule of decision.[57]   It is clear that federal law governs

8 whether a case exceeds the amount in controversy necessary for removal under CAFA.  See *Horton*

9 *v. Liberty Mutual Ins. Co.*, 367 U.S. 348, 352 (1961) ("[D]etermination of the value of the matter

10 in controversy for purposes of federal jurisdiction is a federal question to be decided under federal

11 standards. . .").   Accordingly, federal privilege law controls.  See Fed. R. Evid. 501 (state law

12 privileges apply in civil actions in federal court only "with respect to an element of a claim or

13 defense as to which State law supplies the rule of decision").

14   In *Babasa v. Lenscrafters*, the Ninth Circuit considered the applicability of state privilege

15 law in deciding whether the amount in controversy requirement for diversity jurisdiction had been

16 met and rejected the precise argument Lexmark advances here.  *Babasa*, 498 F.3d at 974-75.  The

17 *Babasa* court held that state privilege law did not apply in determining whether a settlement letter

18 sent "in preparation for [a] mediation" was privileged and thus was not an "other paper" that

19 triggered the commencement of the thirty day removal period.   Rather, it held, federal law

20 controlled.  *Id.*  ("State law does not supply the rule of decision here.  Federal law governs the

21 determination whether a case exceeds the amount in controversy necessary for a diversity action

22 to proceed in federal court," citing  *Breed v. U.S. Dist. Court for the N. Dist. of Cal.*, 542 F.2d

23 1114, 1115 (9th Cir. 1976) (holding that, when a question of federal law is at issue, "[s]tate law

24 [as to privileges] may provide a useful referent, but it is not controlling") and *Horton*, 367 U.S.

25 at 352). Under *Babasa*, California Evidence Code § 1119, which makes certain documents and

26 communications pertaining to mediation inadmissible in civil actions, is inapplicable here.  The

27 ―――――――――――――――

28   [57]*Id.*

1  court thus turns to Lexmark's argument that a federal common law mediation privilege prevents

2  use of communications during mediation for purposes of removal or remand.

3              **b.      Whether the Federal Mediation Privilege Adopted in *Folb* Applies**

4                   **i.      *Folb*'s Adoption of a Mediation Privilege**

5          Lexmark relies on the district court's decision in *Folb* as the basis for its argument that a

6  federal common law mediation privilege precluded it from removing based on the information

7  concerning damages it obtained during the May 2006 mediation.  In *Folb*, a former employee of

8  the Motion Picture Industry Pension & Health Plans ("the Plans") alleged that he had been

9  terminated in retaliation for whistle-blowing activities.  *Folb*, 16 F.Supp.2d at 1166.  The Plans

10  argued that Folb had been terminated because he sexually harassed a fellow employee, Vivian

11  Vasquez.  Folb asserted that this reason was pretextual, and that he had been discharged in

12  retaliation for the objections he voiced to the Plans' violation of fiduciary duties under ERISA.  *Id.*

13  The Plans and Vasquez had previously participated in a mediation in an attempt to settle Vasquez's

14  claims against the Plans arising out of Folb's alleged harassment.  *Id.* at 1167.  Folb sought to

15  compel production of a "mediation brief" prepared by Vasquez's counsel for the mediation, as well

16  as "related correspondence regarding settlement negotiations between the Plans and [ ] Vasquez."

17  *Id.*  Folb asserted the documents would reveal that the Plans had argued during mediation that he

18  had not sexually harassed Vasquez.  *Id.*  The court held that Folb was entitled to discovery

19  regarding settlement negotiations conducted after the close of formal mediation.  *Id.*  It concluded,

20  however, that a federal common law mediation privilege protected the mediation brief from

21  discovery.  *Id.*

22          The court began its analysis by concluding that federal privilege law governed the

23  discoverability of the documents at issue.[58]  *Id.* at 1169-70.  It next noted that under Rule 501 of

24

25  _____

26          [58]Folb's complaint pled claims for violation of the Employee Retirement Income Security
   Act ("ERISA") and state law claims as well.  Because the issue of ERISA preemption had not yet
27  been decided, the court assumed, without deciding, that both state and federal causes of action
   were at issue.  *Folb*, 16 F.Supp.2d at 1168.  This raised the question whether state or federal
28  privilege applied.  *Id.* at 1169.

the Federal Rules of Evidence, federal courts may "define new privileges based on interpretation of 'common law principles . . . in the light of reason and experience.'" *Id.* at 1170 (quoting *Jaffee v. Redmond*, 518 U.S. 1 , 8 (1996)). The court noted, however, that caution should be exercised in creating new privileges given the potential cost to the public and the courts in the form of lost evidence. *Id.* at 1171. It observed that, before creating a privilege, a court must determine whether it would constitute a "public good" by evaluating the factors outlined by the Supreme Court in *Jaffee v. Redmond*: "(1) whether the asserted privilege is 'rooted in the imperative need for confidence and trust[;]' (2) whether the privilege would serve public ends; (3) whether the evidentiary detriment caused by exercise of the privilege is modest; and (4) whether denial of the federal privilege would frustrate a parallel privilege adopted by the states." *Id.* (quoting *Jaffee*, 518 U.S. at 9-13). After analyzing these factors, most particularly the first, the court concluded that a federal common law mediation privilege precluded discovery of the Plans' mediation brief in the Vasquez suit.

### ii.    The Contours of the *Folb* Privilege

The exact contours of the privilege recognized in *Folb* are unclear. The court stated that the privilege it was adopting applied only to "communications between parties who agreed in writing to participate in a confidential mediation with a neutral third party."[59] *Id.* at 1180. As to

---

[59]Lexmark has adduced no evidence that the parties signed a formal written agreement governing the June 2006 mediation. While the statutes and rules governing mediation in state court proceedings may provide an adequate substitute for a written confidentiality agreement, it is possible that the limited privilege recognized in *Folb* may be inapplicable because no written confidentiality agreement was signed.

In limiting the privilege it recognized in this manner, the *Folb* court distinguished between mediation, which is not addressed in the Federal Rules of Evidence, and settlement negotiations, which are governed by Rule 408 of the Federal Rules of Evidence. See FED. R. EVID. 408 (evidence of settlement offers and compromise negotiations is not admissible "to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction"); *Folb*, 16 F.Supp.2d at 1180 ("Any interpretation of Rule 501 must be consistent with Rule 408. To protect settlement communications not related to mediation would invade Rule 408's domain; only Congress is authorized to amend the scope of protection afforded by Rule 408. Consequently, any post-mediation communications are protected only by Rule 408's limitations on admissibility").

other details, the court observed that "the contours of such a federal privilege [will have] to be fleshed out over time." See *id.* at 1179. The court stressed repeatedly that its creation of a federal mediation privilege was limited to the factual context before it, i.e., a situation in which a third party who did not participate in a formal mediation sought discovery of mediation-related communications. See, e.g., *id.* at 1180 ("On the facts presented here, the Court concludes that communications to the mediator and communications between parties during the mediation are protected. In addition, communications in preparation for and during the course of a mediation with a neutral must be protected. Subsequent negotiations between the parties, however, are not protected even if they include information initially disclosed in the mediation").

Only a few decisions have applied the privilege recognized in *Folb*; most of these have involved disputes regarding the discoverability of mediation-related material. The court has found one case in this circuit upholding a claim of privilege under *Folb*, and two cases from other circuits; all addressed the discoverability of mediation-related material, and cited *Folb* in endorsing a mediation privilege.[60] See *Microsoft Corp. v. Suncrest Enterprise*, No. C03-05424 JF, 2006 WL 929257, *2 (N.D. Cal. Jan. 6, 2006) ("this court concludes that most of the deposition questions at issue seek information pertaining to the parties' conversations with the mediator and are, therefore, protected"); *In re RDM Sports Group, Inc.*, 277 B.R. 415, 430-31 (Bankr. N.D. Ga. 2002) ("[T]he evidence is strong that parties engage in mediation with an expectation that the information will remain protected from future use by other parties. . . . The mediation privilege should operate to protect only those communications made to the mediator, between the parties during the mediation, or in preparation for the mediation. Therefore, the mediation privilege does

_____

Implicitly, therefore, the *Folb* court rejected Molina's argument that Congress's adoption of Rule 408 precludes the adoption of a federal common law mediation privilege.

[60]In other cases where parties have asserted a mediation privilege under *Folb*, courts have found that the privilege did not apply because the communications at issue were not "formal mediation." See *E.E.O.C. v. Albion River Inn, Inc.*, No. C 06-05356 SI, 2007 WL 2560718, *2 (N.D. Cal., Sept. 4, 2007); *California Service Employees Health & Welfare Trust Fund v. Advance*, No. C06-3078 CW (BZ), 2007 WL 2669823, *1 (N.D. Cal. Sept. 7, 2007).

not apply to shelter from disclosure documents prepared prior to the mediation, merely because those documents were presented to the mediator during the course of the mediation"); *Sheldone v. Pennsylvania Turnpike Comm'n*, 104 F.Supp.2d 511, 512 (W.D. Pa. 2000) (granting a motion "to preclude the discovery 'through any method . . . , including Plaintiffs' noticed deposition,' of '[a]ll mediation communications and mediation documents'").

Here, Lexmark attempts to invoke a federal mediation privilege in an entirely different context. Because the *Folb* court limited its recognition of the privilege to the factual scenario before it, such a privilege does not apply in this case. Because the cases that have followed *Folb* have involved the same context (i.e., third party attempts to discover the mediation positions of their adversaries in other cases), moreover, it is likewise not clear that they support recognition of a privilege here. This is particularly true when one considers that courts have declined to recognize a federal mediation privilege outside the factual context at issue in *Folb*; that there is a fundamental difference between confidential information and information subject to an evidentiary privilege; that the Ninth Circuit and other courts have held that information that is otherwise privileged under Rule 408 constitutes "other paper" that triggers the thirty day period for removal; and that parties in Lexmark's position frequently rely on information obtained during mediation to support removal of a state action to federal court.

     **c.**     **Whether a Federal Mediation Privilege Should Be Recognized in the Context of Assessing the Timeliness of Removal**

     **(1)**     **The State of the Law Concerning the Existence of a Federal Mediation Privilege**

The existence of a federal common law mediation privilege is not nearly as well established as Lexmark suggests it is. No Circuit court has ever adopted or applied such a privilege; indeed, both the Ninth and the Fourth Circuits have expressly declined to consider whether such a privilege exists. See *Babasa*, 498 F.3d at 975 n. 1 (declining to consider whether a federal mediation privilege exists); *Dusek v. Mattel, Inc.*, 141 Fed.Appx. 586, 588 n. 2 (9th Circ. July 29, 2005) (Unpub. Disp.) (same); *In re Anonymous*, 283 F.3d 627, 639 (4th. Cir.2002) (same). The Fifth

Circuit, moreover, has specifically refused to infer the existence of a mediation privilege from a federal statute making mediation proceedings conducted under its aegis confidential.  See *In re Grand Jury Subpoena Dated December 17, 1996* ("*In re Grand Jury*"), 148 F.3d 487, 493 (5th Cir. 1998).

The Fifth Circuit's analysis in *In re Grand Jury Subpoena* is instructive.  The case concerned a grand jury investigation of suspected criminal wrongdoing by the Texas Agricultural Mediation Program ("TAM").  TAM was a state loan mediation program that received federal funds under the Agricultural Credit Act of 1987.[61]  *Id.* at 489-90.  The grand jury served a subpoena on TAM's custodian of records.  *Id.* at 490.  Parties to a mediation for which records were sought moved to intervene and quash the subpoena "on the ground that documents relating to mediation proceedings involving them [were] protected from disclosure by a mediation privilege."  *Id.*  The district court found that a federal mediation privilege protected the documents at issue from disclosure, and the government appealed.  *Id.*

To determine whether the documents were protected from disclosure by a mediation privilege, the Fifth Circuit examined the requirement in the Agricultural Credit Act that a state provide for the confidentiality of mediation sessions to qualify for funding under the Act.  The court noted that "[i]n imposing this requirement, Congress obviously sought to protect information relating to mediation sessions to some extent.  Confidentiality is critical to the mediation process because it promotes the free flow of information that may result in the settlement of a dispute." *Id.* at 492 (citing Kenneth R. Feinberg, *Mediation – A Preferred Method of Dispute Resolution*, 16 PEPP. L. REV. S5, S28-29 (1989)).  It concluded, however, that there was a distinction between

---

[61]"The Agricultural Credit Act was passed in response to growing problems of farm debt in the United States.  Among other things, the Act provides financial assistance to states for the operation and administration of agricultural loan mediation programs that assist in resolving disputes between farmers and their agricultural lenders.  See 7 U.S.C. § 5102.  To qualify for financial assistance, a state must be certified by the Secretary of Agriculture. See *id.*, § 5101(a). The Secretary will certify a state if it has in effect an agricultural loan mediation program that, among other things, 'provides that mediation sessions shall be confidential[.]'" *In re Grand Jury Subpoena*, 148 F.3d at 489 (quoting 7 U.S.C. § 5101(c)(3)(D)).

1   "confidential" and "privileged" communications.  *Id.* (citing *Nguyen Da Yen v. Kissinger*, 528

2   F.2d 1194, 1205 (9th Cir. 1975) (concluding that INS files regarding Vietnamese children were

3   confidential but not privileged); *State v. Thompson*, 54 Wash.2d 100, 338 P.2d 319, 322 (1959)

4   (holding that the requirement of confidentiality in a statute did not create an evidentiary privilege);

5   and *American Civil Liberties Union of Mississippi v. Finch*, 638 F.2d 1336, 1342 (5th Cir. 1981)

6   (assuming *arguendo* that a confidentiality requirement in statute created an evidentiary privilege)).

7   As a result, although acknowledging that the mediation proceedings mandated by the Agricultural

8   Credit Act were intended to be confidential, the court declined to hold that they were privileged

9   and reversed the district court's finding that a mediation privilege prevented disclosure of the

10  documents to the grand jury.  *Id.* ("Because privileges are not lightly created, *United States v.*

11  *Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), we will not infer one where

12  Congress has not clearly manifested an intent to create one").

13          Other courts have similarly concluded that although confidential, mediation is not

14  privileged.  See *F.D.I.C. v. White*, 76 F.Supp.2d 736, 738 (N.D.Tex. 1999) ("It is obvious that

15  Congress sought to protect communications made during the course of mediation from unwarranted

16  disclosure. . . .  However, "confidential" does not necessarily mean 'privileged.' . . .  Privileges

17  are not lightly created and cannot be inferred absent a clear manifestation of Congressional intent.

18  . . .  The Court does not read the [Alternative Dispute Resolution Act of 1998] or its sparse

19  legislative history as creating an evidentiary privilege that would preclude a litigant from

20  challenging the validity of a settlement agreement based on events that transpired at a mediation"

21  (citations omitted)); *Datapoint Corp. v. Picturetel Corp.*, No. Civ.A. 3:93-CV-2381D, 1998 WL

22  25536, *2 (N.D. Tex. Jan. 14 1998) ("Additionally, the information sought by PictureTel is not

23  privileged. Southern District of Texas Local Rule 20(1), which is a component of the court's

24  Alternative Dispute Resolution rule, does not render otherwise non-privileged settlement

25  communications privileged.  Rather, it deems them to be confidential and protected from

26  disclosure. . ." (footnote omitted)).

27          **(2)      Confidentiality versus Privilege in the Mediation Context**

28  This distinction between evidentiary privilege and confidentiality helps clarify the issue in

19

the present case. Although "confidentiality" and "privilege" are often used interchangeably in discussions of mediation, the terms refer to two distinct concepts.  See Scott H. Hughes, *The Uniform Mediation Act: To The Spoiled Go The Privileges*, 85 MARQ. L. REV. 9, 25-34 (2001) ("The twin principles of the duty of confidentiality and privilege are not identical and, therefore, generate confusion in the field of mediation" (footnote omitted)).  "Confidentiality" refers to a duty to keep information secret, while "privilege" refers to protection of information from compelled disclosure.  See *id.*  Cf. Fred C. Zacharias, *Harmonizing Privilege & Confidentiality*, 41 S. TEX.L.REV. 69, 72 (distinguishing between the duty of "confidentiality" set forth in professional rules protecting client confidences and the attorney-client privilege).  Communications are confidential when the freedom of the parties to disclose them voluntarily is limited; they are privileged when the ability of third parties to compel disclosure of them, or testimony regarding them, is limited.  See Hughes, *supra*, at 25-34.  Distinguishing between these concepts in the mediation context is sometimes difficult because the relationship between the parties to a mediation is different than the type of fiduciary relationship that typically gives rise to an evidentiary privilege or duty of confidentiality (e.g., attorney-client, psychotherapist-patient, clergy-penitent).

> "Despite the conciliatory tone of mediation, the relationship[ ] between parties to a dispute remain[s] adversarial until the dispute is resolved.  To reach a productive outcome, a mediator may seek to earn the confidence and trust of the participants, and some parties may disclose sensitive information to the mediator, but the vulnerability and dependence required for a fiduciary relationship is not an essential quality of mediation. Parties do not need the mediator to resolve their dispute.  Mediation is, after all, a means of alternative dispute resolution.  Mediation is a confrontational process (although that phrase need not suggest a contentious or angry process)."[62]  Eileen A. Scallen, *Relational & Informational Privileges & The Case*

_____

[62]That mediation, unlike other interpersonal relationships where the law recognizes confidentiality or privilege, involves a triangular relationship (between the parties to the dispute and the mediator), rather than a two-sided one, further complicates discussions of mediation-related confidentiality and privilege.  Because the mediator's privilege or duty of confidentiality is not relevant to disposition of this case, the court does not address it here.

*Of The Mysterious Mediation Privilege*, 38 LOY. L.A. L. REV. 537, 590 (2004) (footnote omitted).

In most relationships where the law recognizes a duty of confidentiality, "the duty of confidentiality . . . is imposed upon the professional and not on the person being served. There is no reciprocal duty on the client, penitent, or patient; each is free to disclose at will. . . . [A]lthough the professional is bound by ethical codes or statutory authority to keep client confidences, a duty of confidentiality does not bind third parties who may seek to compel involuntary testimony about the matters covered by the duty of confidentiality." Hughes, *supra*, at 33-34. The duty of confidentiality that arises in the mediation context differs in that it operates as a restriction on both parties. This is true because of the adversarial nature of the relationship:

> "Because mediation involves communications with an adversary, the legal structures that promote confidentiality must do more than function as a restraint on outside parties who seek disclosure; they must also provide a substitute for trust between those who are communicating. This is accomplished by limiting the adverse party's ability to disclose or make use of mediation communications. In this respect, assurances of confidentiality reduce the chilling potential of disclosures, whether initiated from inside or outside the group of mediation participants. Parties are then free to explore possibilities for a resolution to their dispute without worrying about the consequences in the courtroom if their exploration does not succeed." Ellen E. Deason, *The Quest For Uniformity In Mediation Confidentiality: Foolish Consistency Or Crucial Predictability?*, 85 MARQ. L. REV. 79, 82 (2001).

### (3)  Whether the Duty of Confidentiality Prohibits Use of Mediation Information for Purposes of Removal

As the preceding discussion makes clear, although Lexmark asserts reliance on a "mediation privilege," it in fact invokes the duty of confidentiality that prevents parties to a mediation from disclosing mediation communications voluntarily. *Folb*, by contrast, addressed whether a privilege shielded mediation discussions from discovery by third parties. See *Folb*, 16 F.Supp.2d at 1171. Though protecting mediation discussions from compelled discovery and requiring parties to keep

mediation discussions confidential serve the same goal – "encouraging parties to attend mediation and communicate openly and honestly," see *id.* at 1172; Deason, *supra*, at 82 – they are conceptually distinct.

Because of this distinction, Rule 408 of the Federal Rules of Evidence, which makes "conduct or statements made in compromise negotiations regarding the claim" inadmissible to prove liability,[63] provides a better reference point for analyzing Lexmark's argument than does *Folb*. See FED. R. EVID. 408. The purpose of Rule 408 is "to encourage the compromise and settlement of existing disputes." See *Josephs v. Pacific Bell*, 443 F.3d 1050, 1064 (9th Cir. 2006). Like mediation confidentiality, but unlike *Folb*'s mediation privilege (and traditional privileges such as the attorney-client privilege), Rule 408 is primarily concerned with avoiding the chilling effect that potential disclosure may have on a party to a communication, rather than the threat of compelled discovery.

"The purpose of Fed.R.Evid. 408, to encourage settlements, is not undermined by use of a demand letter in a notice of removal." *Archer v. Kelly*, 271 F.Supp.2d 1320, 1323 (N.D. Okla.

---

[63]Rule 408 states:

(a) Prohibited uses.– Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

> (1) furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses. – This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

1   2003) (citing FED. R. EVID. 408 Advisory Committee Notes (1974 Enactment)); see also *id.* ("The
2   Fed.R.Evid. 408 advisory committee's notes (1972 Proposed Rules) indicate that the situations
3   mentioned in the rule are 'illustrative' and do[ ] not foreclose offering 'compromise' evidence for
4   other purposes.  The Court finds that another acceptable purpose is to show that the amount in
5   controversy exceeds $75,000 and, together with complete diversity of the parties, . . . establish[es]
6   removal jurisdiction.  As Kelly points out, the letter is not being offered as an admission of liability
7   or the amount of liability"); see also *Vermande v. Hyundai Motor America, Inc.*, 352 F.Supp.2d
8   195, 202 (D. Conn. 2004) ("Here, the July 8 facsimile [containing a settlement offer] is not offered
9   for the purpose of establishing or fixing the amount of Defendants' liability or even the amount of
10  Plaintiffs' damages but rather merely to provide some evidence of the sums that are in dispute in
11  this action.  While there is, admittedly, some risk that allowing courts to consider settlement offers
12  when assessing the amount in controversy may discourage parties from making settlement offers
13  during the first year of a case, on balance, the Court believes that the underlying rationale for Rule
14  408 cited in the Committee Notes – the limited relevance of such evidence and the public policy
15  of encouraging settlements – is not terribly offended by considering the July 8 facsimile (or for that
16  matter the Offer of Judgment) for the limited purpose of determining the amount in controversy
17  when the pleadings themselves are inconclusive on that subject" (footnote omitted)).[64]

18       Using this rationale, numerous courts, including the Ninth Circuit, have concluded that Rule
19  408 does not make settlement offers inadmissible in the removal context as evidence of the amount
20  in controversy.  See *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 839 n. 3 (9th Cir. 2002) ("We reject
21  the argument that Fed.R.Evid. 408 prohibits the use of settlement offers in determining the amount
22  in controversy.  Rule 408 disallows use of settlement letters to prove 'liability for or invalidity of
23  the claim or its amount.'  We agree with the district court that Rule 408 is inapplicable because this
24  evidence was not offered to establish the amount of Petsmart's liability, but merely to indicate
25
26  _____

27       [64]Because the one year limit on removal does not apply to cases removed under CAFA, 28 U.S.C. § 1453(b), the *Vermande* court's concern about "discourag[ing] parties from making
28  settlement offers during the first year of a case" is absent here.  See *Vermande*, 352 F.Supp.2d at 202.

Cohn's assessment of the value of the trademark"); *Ray v. American Airlines, Inc.*, No. 08-5025, 2008 WL 3992644, *4 (W.D. Ark. Aug., 2008) ("We agree that Rule 408 does not prohibit the use of a settlement letter to establish the amount in controversy"); *Haydel v. State Farm Mut. Aut. Ins. Co.*, No. CIVA 07-939-C, 2008 WL 2781472, *8 n. 8 (M.D. La. July 11 2008) ("Like other courts, the undersigned also rejects the argument that Fed.R.Evid. 408 prohibits the use of settlement offers in determining the amount in controversy"); *Finnegan v. Wendy's Intern., Inc.*, No. 2:08-cv-185, 2008 WL 2078068, *3 (S.D. Ohio May 13, 2008) ("Courts have held that Rule 408 does not preclude the use of settlement offers to establish that the amount-in-controversy requirement has been met"); *Sulit v. Slep-Tone Entertainment*, No. C06-00045 MJJ, 2007 WL 4169762, * 3 n. 1 (N.D.Cal. Nov. 20, 2007);  ("The Court agrees with Defendants that Rule 408 does not prohibit use of settlement evidence that is not offered to prove liability or invalidity of the claim or its amount"); *Turner v. Baker*, No. 05-3298-CV-S-SWH, 2005 WL 3132325, *3 (W.D. Mo. Nov. 22, 2005) ("Other courts that have considered the issue have allowed the use of information exchanged in settlement negotiations to determine if the amount in controversy requirement has been satisfied"); *LaPree v. Prudential Financial*, 385 F.Supp.2d 839, 849 n. 9 (S.D. Iowa 2005) ("Prudential asserts that under Federal Rules of Evidence 408 and Iowa Rule of Evidence 5.408, settlement proposals are inadmissible to prove liability or the amount of a claim, and therefore the court is prohibited from using them to determine the amount in controversy.  This argument has been advanced before and has failed," citing *Cohn*, 281 F.3d at 840 n. 3).

As these cases indicate, use of settlement offers as evidence of the amount in controversy has not hindered Rule 408's goal of encouraging open and honest discussion during negotiation. This makes sense; concern that one's adversary will use statements during negotiation as proof of liability or wrongdoing, not concern that it will use them as proof of the amount in controversy, is the primary obstacle to forthright negotiation discussions.

Given the courts' experience applying Rule 408, Lexmark's argument that the duty of confidentiality that surrounds mediation discussions prohibits use of documents exchanged in that setting for purposes of removal fails.  Courts have found that using statements made during settlement discussions to establish the amount in controversy does not undermine the policy goals

of Rule 408.  That rule, like the duty of mediation confidentiality at issue here, seeks to encourage honest assessment and acknowledgment of litigation strengths and weaknesses by limiting the parties' ability to make use of compromise discussions.  Accordingly, although the parties to a mediation generally have a duty to keep their discussions confidential, this duty does not prevent use of mediation discussions for the limited purpose of establishing the amount in controversy.[65]

### d.   Whether *Folb*'s Policy Concerns Support Prohibiting Use of Documents Exchanged During Mediation for Removal

The court has determined that *Folb*'s focus on the discoverability of mediation-related material limits its relevance here.  Nonetheless, consideration of the concerns underlying *Folb*'s adoption of a federal mediation privilege supports the conclusion the court reaches today.  The *Folb* court evaluated four factors in assessing whether creating a federal mediation privilege would be a "public good": "(1) whether the asserted privilege [was] 'rooted in the imperative need for confidence and trust[;]' (2) whether the privilege would serve public ends; (3) whether the evidentiary detriment caused by exercise of the privilege [was] modest; and (4) whether denial of the federal privilege would frustrate a parallel privilege adopted by the states." *Folb*, 16 F.Supp.2d at 1171 (quoting *Jaffee*, 518 U.S. at 9-13).  In applying these factors to the case before it, the court

---

[65]Although Lexmark asserts that relying on the damages analysis provided to it during mediation would have been "improper," defendants regularly rely on information regarding the amount in controversy learned during mediation to remove.  See *Storball v. Atlantic Recording Corp.*, 989 F.Supp. 845, 846-47 (E.D. Mich.1997) (finding removal proper where the defendant removed a case less than thirty days after "plaintiff submitted a mediation summary claiming damages in the amount of $82,535.48,  plus interest"); see also *Entrekin v. Fisher Scientific Inc.*, 146 F.Supp.2d 594, 617 (D.N.J. 2001)  (rejecting plaintiff's argument that defendant knew the amount in controversy more than thirty days prior to removal, the court noted that "discussions at the August 31, 2000 mediation session certainly cannot justify the remand of this action because the removal occurred a mere one day after this mediation"); *Faasen v. State Farm Fire and Cas. Co.*, 886 F.Supp. 625, 628 (W.D. Mich. 1995) (considering defendant's statement that "[t]hrough the mediation process and statements made by plaintiff's counsel in late May, 1994, it became evident that [plaintiff] sought damages different from, and in excess of, the limits of State Farm Fire & Casualty Company policy no. 22-B2-4623-1" in determining whether the amount in controversy requirement was met and whether remand was appropriate).

1   is mindful that, in enacting Rule 501, Congress intended "to 'provide the courts with the flexibility

2   to develop rules of privilege on a case-by-case basis,' 120 Cong.Rec. 40891 (1974) (statement of

3   Rep. Hungate), and to leave the door open to change." *Trammel v. U.S.*, 445 U.S. 40, 47 (1980).

### (1)     The Need for Confidence and Trust

5        The *Folb* court focused primarily on the need for confidence and trust in the mediation

6   process.  The court noted that allowing third parties to discover "confidential communications with

7   the mediator" would penalize "the side [that had been the] most forthcoming in the mediation

8   process. . . ." *Id.* at 1172.  This threat of compelled disclosure, the court observed, "create[d] an

9   incentive for participants to withhold sensitive information in mediation or refuse to participate at

10  all." *Id.*

11       Prohibiting the use of documents created or prepared for mediation to establish the amount

12  in controversy for purposes of removal or remand, by contrast, will not further *Folb*'s goal of

13  "encouraging parties to attend mediation and communicate openly and honestly." *Id.*  As the facts

14  of this case demonstrate, such a prohibition would give defendants a significant tactical advantage.

15  Lexmark argues that paper evidencing the amount in controversy exchanged during mediation

16  should not start the thirty day removal clock under § 1446(b).  If this were the case, a plaintiff who

17  valued his case above of the jurisdictional amount for removal might well be hesitant to share this

18  information with a defendant during mediation, as doing so would give the defendant an immense

19  tactical advantage.  If the plaintiff revealed in paper exchanged during mediation that he valued his

20  case at an amount over the jurisdictional minimum, the defendant would have objective written

21  evidence of the amount in controversy without being required to act on the knowledge to remove.

22  A defendant in this position could wait to see if the state court ruled in its favor before deciding

23  whether to remove, confident that, at some point before trial, it could elicit an "amended pleading,

24  motion, order or other paper" (in the form of interrogatories, document production requests, and

25  deposition answers) that would once again indicate the case was removable.

26       For these reasons, if paper exchanged during mediation does not start the clock for removal,

27  the effectiveness of mediation will be severely limited.  Plaintiffs will avoid sharing their valuation

28  of the case during mediation because the information will give defendants the ability to "test the

waters" before deciding to remove.  In addition to discouraging honesty during mediation, such a result would be contrary to § 1446(b)'s goal of eliminating unfair forum shopping.  See *Brown v. Demco*, 792 F.2d 478, 482 (5th Cir. 1986) ("The thirty-day time limit imposed by § 1446(b) plays an integral role in preventing defendants from gaining unfair advantage by forum-shopping after testing the waters of state court").  Adopting the rule Lexmark proposes would penalize plaintffs for being forthcoming during mediation – exactly the outcome Folb *sought* to avoid.  See *Folb*, 16 F.Supp.2d at 1172.

### (2)    Public Ends

*Folb* next noted that a mediation privilege "would serve public ends by encouraging prompt, consensual resolution of disputes, minimizing the social and individual costs of litigation, and markedly reducing the size of state and federal court dockets." *Id.* at 1176.  As noted, prohibiting use of documents exchanged during mediation for purposes of establishing the amount in controversy and removing would not encourage prompt and effective mediation; rather, it would force plaintiffs to remain tightlipped or risk giving their opponents a tactical advantage.  *Folb*'s further focus on the institutional costs to courts is instructive as well.  Lexmark's proposed approach would burden state courts with making substantive decisions in cases that are not removed to federal court until the eve of trial so that defendants can "test the waters" before deciding whether they wish to remove.

### (3)    Evidentiary Benefit

In *Folb*, the court  concluded that there was "little evidentiary benefit to be gained by refusing to recognize a . . . privilege" shielding mediation communications from discovery.  It stated:

> "First, evidence disclosed in mediation may be obtained directly from the parties to the mediation by using normal discovery channels.  For example, a person's admission in mediation proceedings may, at least theoretically, be elicited in response to a request for admission or to questions in a deposition or in written interrogatories.  In addition, to the extent a party takes advantage of the opportunity to use the cloak of confidentiality to take inconsistent positions in related litigation,

1    evidence of that inconsistent position only comes into being as a result of the party's

2    willingness to attend mediation.  Absent a privilege protecting the confidentiality of

3    mediation, the inconsistent position would presumably never come to light." *Id.* at

4    1178.

5    This analysis is inapposite in the present context, where the question is when a defendant had notice

6    of the amount in controversy.  As this case makes evident, although a defendant who first learns

7    that the amount in controversy exceeds the jurisdictional limit in mediation has the ability to elicit

8    that same information through formal discovery, it has no incentive to do so until it decides that

9    it is strategically advantageous to remove to federal court.  This permits defendant to control the

10   timing of removal and essentially vitiates the thirty day period set forth in § 1446(b).  *Harris* stands

11   for the proposition that there must be an "objective baseline" to which courts can look in

12   determining when a defendant first knew that a case was removable.  See *Harris*, 425 F.3d at

13   690-91.  If courts cannot consider evidence of papers exchanged in mediation in analyzing the

14   timeliness of removal, *Harris*' objective standard will be undercut.  Under *Harris*, "[o]nce

15   defendant is on notice of removability, the thirty-day period begins to run"; this rule is no less

16   appropriately applied if notice occurs during mediation.  See *Harris*, 425 F.3d at 697 ("The

17   jurisdictional and procedural interests served by a bright-line approach are obvious.  First and

18   foremost, objective analysis of the pleadings brings certainty and predictability to the process and

19   avoids gamesmanship in pleading").  Courts must be able to consider all the papers exchanged

20   between the parties, including those exchanged during mediation, when deciding whether removal

21   is timely.  As the court has emphasized, anything less would lead to exactly the gamesmanship

22   which *Harris*'s objective approach sought to eliminate.

23              **(4)      Frustration of Parallel State Privilege**

24          The fourth factor cited in *Jaffee* and *Folb* is "whether denial of the federal privilege would

25   frustrate a parallel privilege adopted by the states."  *Folb*, 16 F.Supp.2d at 1171 (citing *Jaffee*, 518

26   U.S. at 9-13).  Analyzing this factor, the court in *Folb* noted that, as of 1998, "every state in the

27   Union, with the exception of Delaware, [had] adopted a mediation privilege of one type or

28   another."  See *id.* at 1179 (citing  Pamela A. Kentra, *Hear No Evil, See No Evil, Speak No Evil:*

*The Intolerable Conflict for Attorney-Mediators between the Duty to Maintain Mediation Confidentiality and the Duty to Report Fellow Attorney Misconduct*, 1997 B.Y.U.L. REV. 715, Appendix A (collecting statutes)).  It observed, however, that the scope of the mediation privilege was not consistent across the states.  See *id*.  Nonetheless, the court found that recognizing a federal mediation privilege was appropriate.  See *id*. ("The fact that the states have not settled on the scope of protection to provide should not prevent the federal courts from determining that in light of reason and experience we should adopt a federal mediation privilege").

The inconsistency in the scope of the mediation privilege recognized by the states remains unaltered since *Folb* was decided.  See Ellen E. Deason, *The Need For Trust As A Justification For Confidentiality In Mediation: A Cross-Disciplinary Approach*, 54 U. KAN. L. REV. 1387, 1389 n. 14 (2006) (citing Ellen E. Deason, *Predictable Mediation Confidentiality in the U.S. Federal System*, 17 OHIO ST. J. ON DISP. RESOL. 239, 255-80 (2002)  ("In sum, state mediation privilege statutes vary greatly in both their structure and their substantive exceptions that permit disclosures")).  Thus, while the fact that most states have adopted a mediation privilege might conceivably weigh in favor of the rule Lexmark urges, the lack of uniformity in the privileges recognized limits the weight to which this factor is entitled.

### (5)    The Reduced Expectation of Mediation Confidentiality in the Class Action Context

The court's decision regarding the use of documents exchanged during mediation to establish the amount in controversy is also influenced by the reduced expectation of confidentiality in class action mediation proceedings.  One group of researchers analyzed all state and federal court decisions pertaining to mediation available through Westlaw's "allstates" and "allfeds" databases for the years 1999 through 2003.   They concluded that there was little expectation of confidentiality in class action mediation proceedings:

> "The level of vigilance for maintaining the confidentiality of mediation discussions varies depending on the context of the litigation.  If the mediation settlement affects the rights of third parties, such as settlement in class action cases, the expectation of confidentiality appears to disappear or be substantially diminished.  Indeed, not

1    a single one of the thirty-four class action opinions in the database presented a

2    confidentiality dispute. Mediators offered testimony in twelve and parties offered

3    mediation evidence in twenty-two of these  cases.  In short, the bargaining process

4    in class actions is closely scrutinized and frequently placed on the public record –

5    whether the settlement is reached through unfacilitated negotiation or with the

6    assistance of a mediator." James R. Cohen & Peter N. Thompson, *Disputing Irony:*

7    *A Systematic Look at Litigation About Mediation*, 17 HARV. NEGOT. L. REV. 43, 68-

8    69  (2006).

9        Whatever the contours of the federal mediation privilege recognized in *Folb*, therefore, or

10   the general desirability of maintaining mediation confidentiality, neither privilege nor duties of

11   confidentiality prevent reliance on documents exchanged during mediation to establish the amount

12   in controversy.   At least in the context of class action litigation, where the expectation of

13   confidentiality regarding mediation is diminished because the rights of third parties are involved

14   and the court must scrutinize settlements to ensure that class members' rights are protected, neither

15   the mediation privilege created in *Folb* nor the general duty of mediation confidentiality entitled

16   Lexmark to refrain from removing based on information learned from documents exchanged during

17   mediation.

18          **2.      Whether Lexmark's Removal Was Timely**

19       Molina argues that Lexmark had notice that the amount in controversy exceeded $5 million

20   more than thirty days prior to the removal (1) because the amount in controversy was

21   communicated in settlement negotiations after the initial mediation; (2) because Lexmark could

22   calculate the amount in controversy based on information in its own records; and (3) because

23   Molina's counsel shared plaintiffs' damages analysis with Lexmark during the May 2, 2006

24   mediation, and this, coupled with Molina's subsequent amendment of the complaint, put Lexmark

25   on notice that more than $5 million was claimed in the case.

26          **a.      Rudy's April 2008 Settlement Communications**

27       In an April 17, 2008 letter to Molina's counsel, mediator Rudy stated that he told Lexmark

28   attorney "Frank Liberatore that it will probably take $8 million to $10 million to resolve this

dispute short of a trial."[66]   In a second letter the following day, Rudy states that he "informed Frank Liberatore that the matter, in your view, would have to settle closer to $10 million than to $5 million."[67]   It appears these letters reference oral statements Rudy made to Liberatore.[68]

Although the Ninth Circuit has held that a settlement letter provides sufficient notice of the amount in controversy to trigger the thirty-day window for removal under § 1446(b), see, e.g., *Babasa*, 498 F.3d at 974-75, it has not directly addressed whether oral settlement communications likewise start the removal clock.   In *Harris*, however, the Ninth Circuit stated that courts should "rely on the face of the initial pleading and on the documents exchanged in the case by the parties to determine when the defendant had notice of the grounds for removal, requiring that those grounds be apparent within the four corners of the initial pleading or subsequent paper." *Harris*, 425 F.3d at 695 (quoting *Lovern*, 121 F.3d at 162).   *Harris*' focus on the information contained in documents exchanged in the case appears to preclude consideration of oral settlement offers for purposes of assessing the timeliness of removal under § 1446(b).   Such an inquiry might easily devolve into the type of "collateral litigation" over defendant's subjective knowledge that the *Harris* court sought to avoid.   See *id*. at 697; see also *Thomas v. Ritter*, No. 3:98CV530-H, 1999 WL 1940047, *2 (W.D.N.C. Feb. 11, 1999) ("Allowing oral communications of settlement offers to establish the amount in controversy would present enormous proof problems, and potentially require an evidentiary hearing on every notice of removal and motion for remand.   Accordingly, the statute is worded specifically to require written notice, in a pleading or otherwise, that the amount in controversy exceeds the jurisdictional threshold"); *id*. at *2 n. 2 (collecting cases in

---

[66]Thomas Supp. Decl., Ex. B.

[67]Thomas Supp.Decl., Ex. C.

[68]Although the court has concluded that no federal mediation privilege applies under the circumstances of the present case, it is unclear whether, even if such a privilege were recognized, it would apply to Rudy's letters.   Specifically, the record does not reflect whether Rudy's letters were sent in order to continue formal mediation proceedings, or whether they were communications outside the formal mediation process.   See *Folb*, 16 F.Supp.2d at 1180 ("Subsequent negotiations between the parties, however, are not protected even if they include information initially disclosed in the mediation").

1   which oral notice of diversity jurisdiction triggered removal and noting that in all such cases, "the

2   oral notices were given in court proceedings and/or in the presence of the presiding judge, thereby

3   removing any proof problems regarding who said what at what time"); *Smith v. Bally's Holiday*,

4   843 F.Supp. 1451, 1454 (N.D. Ga. 1994) ("the court finds that oral communication between

5   counsel, not reduced to writing (or not capable of immediate reduction to writing), and not of a

6   nature any more specific than that damages would be sought 'in the six-figure range,' does not

7   satisfy the language of § 1446(b)"); but see *Chase*, 110 F.3d at 428-30 (discussing a "settlement

8   offer" made at a "settlement conference" as evidence of amount in controversy without specifying

9   whether the offer was oral or written); *Burns*, 31 F.3d at 1097 (discussing a "settlement offer" as

10   evidence of the amount in controversy without specifying whether the offer was oral or written).

11   Given the reference in § 1446(b) to "an amended pleading, motion, order or other paper," and the

12   holding in *Harris*, the court concludes that Rudy's April 2008 communications with Liberatore,

13   which appear to have been oral, do not constitute "other paper" triggering Lexmark's obligation

14   to remove.

15           **b.      Lexmark's Ability to Calculate the Amount in Controversy Based**

16                   **on its Own Records**

17           Molina next asserts that Lexmark knew from its own employee records that the amount at

18   issue in the amended complaint exceeded $5 million.  Molina contends that the "formula" rquired

19   to calculate the amount in controversy from Lexmark's employee records was available to the

20   company either because it was disclosed during the May 2, 2006 mediation or because it was

21   "obvious."   The court assumes without deciding that Lexmark knew the "formula," and that

22   applying the formula to data in its possession would have revealed an amount in controversy

23   greater than $5 million.  The question is the "duty to investigate" jurisdictional facts that *Harris*

24   proscribes encompasses "investigating" data in defendant's possession.

25           *Rico-Chinn v. Prudential Ins. Co. of America*, Case No. C-05-01975 MMC, 2005 WL

26   1632289 (N.D. Cal, July 12, 2005), addressed an analogous question.  Although decided before

27   the Ninth Circuit's decision in *Harris*, *Rico-Chinn* employed the type of objective analysis endorsed

28   in *Harris*, and relied on the same authorities the Ninth Circuit found persuasive.  See *Rico-Chinn*,

2005 WL 1632289 at *2 ("Of the five courts of appeals to have addressed the issue, . . . all have held that 'the thirty day time period . . . starts to run from defendant's receipt of the initial pleading only when that pleading affirmatively reveals on its face that the plaintiff is seeking damages in excess of the minimum jurisdictional amount of the federal court,'" quoting *Chapman*, 969 F.2d at 163 and citing *In re* 228 F.3d 896, 897 (8th Cir. 2000); *Huffman v. Saul Holdings Ltd.*, 194 F.3d 1072, 1077 (10th Cir. 1999); *Lovern*, 121 F.3d at 162; and *Foster v. Mutual Insurance Co.*, 986 F.2d 48, 54 (3d Cir. 1993)).

Rico-Chinn had filed a complaint in state court seeking disability benefits owed under an insurance contract. *Id.* at *1. The complaint did not allege a specific amount in controversy. *Id.* The insurance company removed the case to federal court after Rico-Chinn stated in response to an interrogatory that she sought $87,673.81 in damages. *Id.* Rico-Chinn argued that the removal was untimely because the insurer could have ascertained the amount in controversy at the point her complaint was filed. *Id.* at *2. Specifically, she argued that the complaint alleged she was 58, and sought payment of monthly disability benefits until she reached the age of 65. *Id.* Since the insurer's records disclosed the amount of her past monthly payments, Rico-Chinn asserted that it could easily have calculated the amount in controversy using the information in its records. *Id.* The court rejected this argument, and held the removal was timely. *Id.* at *3. It noted that a defendant's own records cannot logically constitute "other paper" under § 1446(b), which provides that the removal period "commences only with the defendant's 'receipt' of an 'other paper.'" "Plaintiff's theory that defendant 'received' its own records, i.e., documents created and maintained by defendant," the court stated, was "inconsistent with the plain language of the statute." *Id.* Even if Lexmark could have ascertained that the amount in controversy exceeded $5 million by reviewing its own records, therefore, this would not have triggered the thirty day period for removal under § 1446(b).

###### c.    The Damages Analysis Provided to Lexmark During Mediation

Finally, the court considers Molina's argument that the damages analysis provided to Lexmark during mediation, coupled with the amended complaint, put Lexmark on notice that the claims in the amended pleading exceeded the jurisdictional minimum under CAFA. Molina asserts

that the analysis provided to Lexmark during the 2006 mediation calculated total damages of $4.09 million.[69]  As noted, the documents actually reflected total unpaid wages and statutory penalties, excluding interest, of $5,012,781.[70]  Molina's figure of $4.09 million excludes penalties for current workers.  This appears to be a correct interpretation of California Labor Code § 203.[71]  The court presumes, therefore, that both parties understood penalties could not be collected for current employees, and that the damages analysis effectively showed a potential recovery for plaintiffs of $4.09 million.  If this damages analysis was received by defendant during the mediation, it is clear that, the following month, when Molina amended his complaint to include allegations regarding Lexmark's failure to pay employees for accrued personal days,[72] to expand the class period for an additional ten years, and to add a request for punitive damages, Lexmark had sufficient information to determine that the amount in controversy exceeded $5 million, and that the action was removable.  As the court has concluded that no mediation privilege or duty of confidentiality precludes reliance on the document, the question becomes whether the damages analysis constitutes "other paper" for purposes of § 1446(b) and whether it was received by Lexmark.

> **(1)      Whether the Damages Analysis Allegedly Exchanged During the Mediation Was "Other Paper"**

In analyzing whether the damages analysis constitutes "other paper" for removal purposes,

---

[69]Thomas Decl., ¶ 5.

[70]*Id.*, Ex. 1, 3.    The court's figure is the sum of the "Cumulative Lost Vac[ation] Dollars," and "Cumulative Waiting Penalty" columns on the "Summary of Damages for Former Employees" and the "Cumulative Lost Vac[ation] Dollars" and "Cumulative Penalty" columns from the "Summary of Damages for Current Employees."

[71]California Labor Code § 203, which provides for statutory penalties, provides: "If an employer willfully fails to pay . . . in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee *who is discharged or who quits*, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."  CAL. LABOR CODE § 203.

[72]Amended Complaint, attached to Plaintiff's Motion for Leave to File Amended Complaint, ¶ 12.

the court once again finds *Harris* instructive. *Harris* was a disability benefits suit brought by an insured against his insurer and its agent. *Harris*, 425 F.3d at 691. Harris lived in Montana and alleged that the agent, Brown, was also a citizen of that state; this prevented removal of the action to federal court. The state court set trial for February 2004. In late October 2003, the insurer filed a motion to continue the trial because, among other things, Harris had not yet served or dismissed Brown. *Id.* When Harris' counsel opposed a continuance in an October 21, 2003 letter, the carrier concluded that he had abandoned his claims against Brown. *Id.* It contacted Harris to ascertain whether he intended to attempt service on Brown; when it received no response, the insurer removed the action on November 3, 2003. *Id.* at 691-92. Asserting that citizenship of the parties was completely diverse because Brown was no longer a party, the insurer alleged that the thirty-day period for removal began to run on October 21, when Harris' attorney wrote the letter opposing a continuance. *Id.* at 692. Harris filed a motion to remand, arguing that the insurer's removal was untimely. *Id.* The district court concluded otherwise. *Id.*

The appellate court held that "notice of removability under § 1446(b) is determined through examination of the four corners of the applicable pleadings, not through subjective knowledge or a duty to make a further inquiry." *Id.* at 694. When "details [regarding grounds for removal] are obscured or omitted [from the initial pleadings], or indeed misstated," the court observed, "that circumstance makes the case 'stated by the initial pleading' not removable, and the defendant will have 30 days from the revelation of grounds for removal in an amended pleading, motion, order, or other paper to file its notice of removal." *Id.* (quoting *Lovern*,121 F.3d at 162 (emphasis original)).

Applying this rule, the court concluded that the insurer's removal had been timely. Specifically, it concluded that, because Harris' complaint did not allege facts reflecting complete diversity of citizenship between all plaintiffs and all defendants, the thirty-day period did not begin to run until Bankers' receipt of the October 21, 2003 letter from Harris' attorney indicating that Harris did not intend to pursue claims against the non-diverse agent. *Id.* at 695-96.

In assessing the timeliness of removal, *Harris* focused on the objective information available to the removing party, i.e., the information contained within the four corners of initial and

35

subsequent pleadings, and other paper received during the litigation.  See *id.* at 695 (stating that courts need not "inquire into the subjective knowledge of the defendant, an inquiry that could degenerate into a mini-trial regarding who knew what and when.  Rather, [they] will . . . rely on the face of the initial pleading and on the documents exchanged in the case by the parties to determine when the defendant had notice of the grounds for removal, requiring that those grounds be apparent within the four corners of the initial pleading or subsequent paper," quoting *Lovern*, 121 F.3d at 162).

This bright-line rule aims to bring "bring certainty and predictability to the process and avoids gamesmanship in pleading" on the part of the plaintiff.  *Harris*, 425 F.3d at 697 & n. 8 (citing *In re Willis*, 228 F.3d at 897 ("The rule prevents a plaintiff from disguising the amount of damages until after the thirty-day time limit has run to avoid removal to federal court")); *id.* at 697 n. 9 (stating that such a rule "avoids the spectre of inevitable collateral litigation over whether the pleadings contained a sufficient 'clue,' whether defendant had subjective knowledge, or whether defendant conducted sufficient inquiry," citing *Soto v. Apple Towing*, 111 F.Supp.2d 222, 226 (E.D.N.Y. 2000) ("[T]here is no requirement in 28 U.S.C. § 1446(b) that a defendant exercise a duty to investigate, and this Court will not read into the statute such a condition.  To do so would invite wasteful litigation as parties spar over the issues of diligence and ascertainability")); see also *Chapman*, 969 F.2d at 163 ("[Imposing a duty to investigate when a defendant receives an indeterminate complaint as to removability] would needlessly inject uncertainty into a court's inquiry as to whether a defendant has timely removed a case, and as a result would require courts to expend needlessly their resources trying to determine what the defendant knew at the time it receive the initial pleading and what the defendant would have known had it exercised due diligence")).

Utilizing an objective analysis defeats gamesmanship by defendant as well, since "[o]nce defendant is on notice of removability, the thirty-day period begins to run."  *Harris*, 425 F.3d at 697.  This goal is supported by considering documents shared during mediation as "other paper" that can trigger the thirty day removal period.   As noted earlier, if such documents did not start the running of the removal clock, defendants could obtain objective written notice of removability

1  without a concomitant obligation to act on it in thirty days.  Accordingly, the court holds that the

2  damages analysis at issue here, if received by Lexmark during mediation, was an "other paper"

3  that triggered the commencement of the thirty day period under § 1446(b).[73]

4  _____

5  [73]At the hearing, counsel for Lexmark argued that even if the company had received the

6  damages analysis during the mediation, it would not have been required to remove after the filing
   of the amended complaint because the analysis did not reflect a reasonable estimate of Molina's

7  claims.  Counsel cited statements in *Cohn* that "[a] settlement letter is relevant evidence of the
   amount in controversy if it appears to reflect a reasonable estimate of the plaintiff's claim," and

8  that "Cohn could have argued that the demand was inflated and not an honest assessment of

9  damages, but he made no attempt to disavow his letter or offer contrary evidence."  See *Cohn*,
   281 F.3d at 840.  Counsel asserted that unlike Cohn, Lexmark "disavowed" Molina's estimate

10 and contended it was "unreasonable."  Lexmark stands in a different position than Cohn.  Cohn
   was the plaintiff, not the removing defendant.  The court merely observed that the settlement letter

11 Cohn sent to the defendant was sufficient to establish the amount in controversy because Cohn did

12 not attempt to disclaim his damages demand or assert that it was inflated and did not reflect the
   true value of the case.  See *id.* at 839-40.  It does not follow from the court's analysis in *Cohn* that

13 a plaintiff's settlement offer should be deemed "unreasonable" because a defendant "disavows"

14 it.  A defendant may disagree with plaintiff regarding his valuation of a lawsuit, but that does not
   mean that the amount claimed by plaintiff is not "in controversy."  Molina has not "disavowed"

15 the damages analysis prepared for the mediation in 2006 or suggested in any way that it does not
   reflect a "reasonable estimate" of damages recoverable by the class.

16
       Counsel for Lexmark also argued that the estimate set forth in the damage analysis was

17 unreasonable because (1) it was assumed that no Lexmark employee had taken vacation days; and
   (2) the analysis included vacation pay owed to current employees, who are not entitled to accrued

18 vacation pay until termination under California Labor Code § 227.3.  As respects Lexmark's first
   argument, Molina contends that Lexmark workers are entitled to be paid for all vacation days they

19 accrued during their employment because Lexmark admittedly failed to maintain records regarding

20 the use of vacation days.  The validity of this position has not yet been adjudicated, and it is not
   so unreasonable on its face as to warrant discounting Molina's damages estimate.

21
       As respects Lexmark's second argument, under California law, an employee's right to

22 vacation pay vests as it is earned through labor.  *Suastez v. Plastic Dress-Up Co.*, 31 Cal.3d 774,
   784 (1982) ("Case law from this state and others, as well as principles of equity and justice,

23 compel the conclusion that a proportionate right to a paid vacation 'vests' as the labor is rendered.

24 Once vested, the right is protected from forfeiture by [California Labor Code] section 227.3");
   see also *Boothby v. Atlas Mechanical, Inc.*, 6 Cal.App.4th 1595, 1597 (1992) ("Paid vacation

25 provided by an employment agreement vests as the employee labors").  The vested nature of the

26 right is not affected by the California Court of Appeal's statement in *Church v. Jamison*, 143
   Cal.App.4th 1568 (2006), that "[u]nder Labor Code section 227.3, an employee has the right to

27 be paid for unused vacation only after the 'employee is terminated without having taken off his
   vested vacation time.'  Thus, termination of employment is the event that converts the employer's

28 obligation to allow an employee to take vacation from work  into the monetary obligation to pay

37

1    The fact that Lexmark had to combine the information contained in the damages analysis

2    with the new allegations in the amended complaint to determine that more than $5 million was at

3    issue does not alter this analysis.   Although a defendant need not investigate facts outside the

4    pleadings and litigation papers to determine removability, this does not mean that it can avoid

5    making simple calculations using objective facts contained within those pleadings and papers to

6    ascertain the amount in controversy.   See *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536,

7    541-42 (7th Cir. 2006) (citing "calculation from the complaint's allegations"as one manner in

8    which a defendant can establish that the amount in controversy satisfies the jurisdictional

9    minimum); *Town of Ogden Dunes v. Siwinski*, No. 2:08-CV-78, 2008 WL 1804104, *3 (N.D. Ind.

10   Apr. 17, 2008) ("The Siwinskis have failed to demonstrate that the case was not removable after

11   receipt of the Complaint.  They admit, through their Notice of Removal, that the Complaint sought

12   'a fine in an amount up to $2,500 per day that the violation alleged hereunder exists.'  The amount

13   of days subject to penalty under the ordinance is revealed by the Complaint's allegation that the

14   Siwinskis were in violation from as early as June 18, 2007 up through and including the time of

15   the filing of the Complaint.  This totals seventy-five (75) days of potential violations, and at $2,500

16   a day, the Complaint immediately put the Siwinskis on notice that there was at least $182,500 in

17   controversy" (citations omitted)); *Locklear Elec. v. My Overhead Corp.*, No. 07-788-GPM, 2007

18   WL 4225732, *4 (S.D. Ill. Nov. 26, 2007) ("Any willful violation of TCPA is punishable in a

19

20   that employee for unused vested vacation time."   *Id.* at 1576.   Earlier in this litigation, the

21   Superior Court rejected the very argument Lexmark now advances as a basis for finding Molina's
     damages estimate to be "unreasonable."  In ruling on Lexmark's motion for summary judgment,

22   the Superior Court held that while current employees might not be able to sue for damages under
     § 227.3 until termination, they could obtain a declaratory judgment regarding their entitlement to

23   vacation pay.  (Compendium of Declarations and Exhibits in Support of Defendant's Notice of

24   Removal ("Removal Compendium"), Ex. JJJJ at 2-3.)  "[T]he requirement under CAFA that the
     amount in controversy exceed $5 million in the aggregate may be established 'either from the

25   viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief

26   sought (e.g., damages, injunctive relief, or declaratory relief).'"  *Rippee*, 408 F.Supp.2d at 984
     (quoting S. Comm. on the Judiciary, Class Action Fairness Act of 2005, S.Rep. No. 109-14, at

27   40 (Feb. 28, 2005), reprinted in 2005 U.S.C.C.A.N. 3, 2005 WL 627977).  For all of these
     reasons, Molina's damages analysis was a reasonable estimate, and Lexmark's argument to the

28   contrary fails.

private civil action under the statute through damages in an amount equivalent to the actual loss caused by the violation or $1,500, whichever is greater.   In light of the allegations of the complaint, proof that Defendants transmitted a mere 3,334 unsolicited advertisements via fax over a period of five years would satisfy the $5 million jurisdictional threshold under CAFA. Accordingly, the Court believes that the allegations of Locklear's second amended complaint joining iBid as a party Defendant were sufficient to put iBid on notice that the amount in controversy in this case exceeds $5 million, so that iBid's attempted removal of this case more than thirty days after receipt of the second amended complaint is untimely" (citations omitted)); *Doss v. Albertson's LLC*, 492 F.Supp.2d 690, 694 (W.D. Tex. 2007) ("A simple computation would show that this claim was for at least $317,408 in damages.   Even setting aside Plaintiff's claims for compensatory damages and benefits, Plaintiff's discovery response made clear to Defendants that Plaintiff sought more than $75,000.   In so holding, the Court is not inquiring into what Defendants 'may or may not subjectively know,' and it is not requiring Defendants to engage in due diligence to determine the extent of Plaintiff's allegations.   Instead, the Court relies on an objective reading of Plaintiff's allegations, aided by 'a modicum of effort and a couple of simple mental calculations'" (citations omitted)).

### (2)    Whether Lexmark Received the Damages Analysis During Mediation

Because the court has concluded that the damages analysis is "other paper" that could trigger defendant's obligation to remove, it must now address the parties' dispute as to whether Lexmark received the document during mediation.  Molina has proffered the declarations of his attorneys, Sheila Y. Thomas and Antonio Lawson, and the damages analysis itself, as evidence that it was provided to Lexmark during mediation.  Both Thomas and Lawson attended the mediation, and state that Lexmark counsel Frank Liberatore received the damages analysis at that time.[74]  They assert that Liberatore made a correction to the calculations reflected in the analysis, that Thomas called Molina's expert regarding the correction, that the expert faxed a corrected analysis, and that

---

[74]Thomas Decl., ¶¶ 3-5; Thomas Supp. Decl., ¶¶ 2-4; Lawson Decl., ¶¶ 2-4.

Liberatore received a copy of this new document as well.[75]    Lexmark counters with the declarations of its counsel, Liberatore and Robert Patton, and its "Human Resources Generalist" Rebecca Cox.  All three were present at the mediation and state that Molina's counsel never shared the documents in question with Liberatore.[76]  The court finds the detailed account of events of the mediation found in the declarations of Molina's lawyers more credible than the general denials contained in the substantially identical declarations submitted by Lexmark's representatives.[77] First, the mediation between Molina and Lexmark would have been singularly ineffective had the parties not at some point shared their valuations of the case.  Second, the date of May 4, 2006 on the revised damages analysis sent to Thomas and attached to her declaration provides contemporaneous support for her description of events and for the fact that Liberatore received a copy of the document during the mediation and made a correction to it.[78]

Lexmark does not offer an alternate account of the events that took place at the mediation to support its claim that it did not receive the damages analysis.[79]  Instead, it argues that the history of the litigation post-mediation is inconsistent with Molina's claim that his counsel shared the damages analysis during the mediation.  Lexmark first contends that Molina "never provided [it] with a calculation or estimate of damages of any kind (e.g., the amount of pay owed to class members based on accrued and unused vacation and personal choice days, or any other damages)"

_____

[75]*Id.*

[76]Liberatore Decl., ¶¶ 5-9; Cox Decl., ¶¶ 5-10; Patton Decl., ¶¶ 3-8.

[77]See Thomas Decl., ¶¶ 3-5 and Ex. 3.; Thomas Supp. Decl., ¶¶ 2-4; Lawson Decl., ¶¶ 2-4.

[78]The mediation took place on May 2, 2006.  Thomas declares that she asked the expert consultant to email her a copy of the corrected analysis two days after the mediation concluded because she did not have a copy of it.  (Thomas Supp. Decl., ¶ 3).

[79]Lexmark's contention at the hearing that it had no opportunity to respond to plaintiff's claims regarding the mediation because they were raised in reply is meritless.  Plaintiff first asserted that Lexmark received the damages analysis during mediation and that Liberatore made corrections to it in its initial memorandum of points and authorities and the declaration of Sheila Thomas supporting that memorandum.  (See Mot. Remand at 1, 3; Thomas Decl., ¶¶ 3-5.)

despite "multiple discovery requests asking [Molina] to state the amount of damages."[80]  It also asserts that Molina's February 13, 2008 motion for bifurcation of liability and damages at trial, which the Superior Court granted on April 2, 2008, is evidence that Molina did not share a damages analysis during the mediation.[81]  Molina argued to the state court that bifurcation would allow determination of issues bearing on the amount of damages (such as "(1) the time periods during which class members are entitled to recover vacation wages; (2) whether liquidated or other enhanced damages need to be calculated for all or some of the class period, and, if so, for which class members, under what law, and at what rate; and (3) entitlements to prejudgment interest") before a bifurcated second phase trial, thus "ensuring that discovery and proof related to damages are properly targeted.[82]  Finally, Lexmark cites the fact that the report prepared by Molina's damages expert, economist Amy Aukstiknalis, did not rely on or refer to the 2006 damages analysis.[83]

Lexmark's arguments are unavailing given the time line in the case and Molina's consistent position that class members are entitled to recover all accrued vacation and personal days because of Lexmark's failure to keep records of its employees' use of such days.  The damages analysis that Molina claims to have shared with Lexmark during the May 2, 2006 mediation was prepared by Molina's "expert consultant," Richard Drogin, from "salary information for 111 employees employed by Lexmark from 2001 through early 2006"; Lexmark provided this information to Molina prior to the mediation.[84]  Drogin's damages calculations do not reflect that Molina had access to any information regarding the number of unused accrued vacation days to which each employee was entitled; rather, they are based on an assumption that no employee used any of his

---

[80]Liberatore Decl., ¶ 14.

[81]Opp. at 5; Liberatore Decl., ¶ 20.

[82]Plaintiff's Motion for Bifurcation of Liability and Damages Issues at Trial at 4 (Removal Compendium, Ex. SSS, at 3178).

[83]Opp. at 5-6; Liberatore Decl., ¶¶ 21-26.

[84]Thomas Decl., ¶¶ 3-4; Lawson Decl., ¶¶ 2-3.

or her vacation days.[85]   Contrary to Lexmark's assertion that Molina's subsequent interrogatory answers demonstrate that he had made no attempt to calculate damages, the responses are consistent with the analysis Drogin prepared.   Lexmark served its first set of special interrogatories on August 10, 2007; Molina responded on September 14, 2007.[86]   Lexmark served its second set of special interrogatories on March 21, 2008; Molina responded on May 1, 2008.[87]   In response to an interrogatory asking that Molina state all facts on which he based his contention that class members had accrued, unused vacation time, Molina stated, in part: "Lexmark failed to track or record vacation and personal choice days taken and those days that remained at year end and has no documents reflecting accrued and used vacation days for California employees."[88]   In another response, Molina contended that, because of this failure, "[a]ll class members are entitled to all vacation and personal choice days accrued subject to any records reflecting any days taken during their employment."[89]   The balance of the interrogatory responses consistently reflect this position.[90]   As can be seen, the assumption on which Drogin's damages analysis was based is also reflected in Molina's responses to Lexmark's interrogatories, i.e., that class members are entitled to recover for 100% of the vacation and personal days to which they were entitled under Lexmark's policies because the company failed to keep adequate records as to how much vacation and/or personal time employees used.   As a result, the court is not persuaded by Lexmark's argument that Molina's discovery responses are inconsistent with his contention that his lawyers shared the damages analysis with Lexmark during the mediation.

Similarly, Molina's motion to bifurcate liability and damages to assure efficient discovery

---

[85]Thomas Decl., Ex. 1-3.

[86]Liberatore Decl., ¶¶ 16-17.

[87]*Id.*, ¶¶ 18-19.

[88]Liberatore Decl., Ex. 2 at 5.

[89]*Id.* at 42-43.

[90]See, e.g., *id.* at 8, 14, 20, 36, 42-46.

1 and trial proceedings is not inconsistent with Molina's claim that he provided the damages analysis

2 to Lexmark during mediation.  As noted, Molina has consistently asserted that Lexmark's failure

3 to keep records makes it liable for all vacation and personal day pay to which its employees were

4 entitled during the relevant period.  Nothing in the damages analysis Molina contends he shared

5 during mediation suggests that he was in possession of information that would have made

6 bifurcation and further damages discovery unnecessary.

7       Finally, the court finds Lexmark's arguments regarding Molina's expert witnesses

8 unconvincing.  In an answer to Lexmark's second set of interrogatories, Molina stated that he

9 intended to call Richard Drogin, the expert consultant who prepared the 2006 damages analysis,

10 to testify at trial regarding damages.[91]  Molina apparently changed his mind, however, and on May

11 15, 2008, sought leave to designate Aukstikalnis as his damages expert.[92]  Lexmark cites Molina's

12 statement in the application in which he sought leave to designate Austikalnis that "[t]here are no

13 written reports or memoranda.  There are no summaries of data.  There have been no analyses

14 based on information other than that which [Lexmark] has provided and has had full opportunity

15 to review and analyze on its own."[93]  It suggests that these statements constitute an admission that

16 no prior damages analysis was made.  Reading the statements in context, it is clear that they refer

17 to reports, memoranda, summaries, and analyses prepared by Austiknalis, not Drogin, the

18 consultant who prepared the initial damages assessment used during the 2006 mediation.  As a

19 result, they are not inconsistent with Molina's claims regarding what took place at the mediation.

20 It is, of course, not surprising that a new expert entering the case would make her own calculations

21 rather than rely on those prepared by a prior expert based on a different class period.

22       In sum, having reviewed all of the evidence in the record, the court finds that Molina's

23 counsel shared the damages analysis with Liberatore during the May 2, 2006 mediation.  As a

24 result, Lexmark received objective written notice of the amount in controversy more than thirty

---

26 [91]Liberatore Decl., Ex. 4 at 5.

27 [92]*Id.*, Ex. 5.

28 [93]*Id.* at 2; Opp. at 5.

43

1  days before it removed the case to federal court on July 22, 2008.  Consequently, its removal was

2  untimely and Molina's motion to remand must be granted.

3       **D.**     **Molina's Request for Attorneys' Fees**

4       Molina seeks an award of $10,925 in attorneys' fees under 28 U.S.C. § 1447(c),

5  representing the expenses he incurred filing the instant motion to remand.[94]  Section 1447(c)

6  provides in part: "An order remanding the case may require payment of just costs and any actual

7  expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).

8       Attorneys' fees may be awarded under § 1447(c) even absent a finding that the

9  removal was frivolous, vexatious, or in bad faith.  See *Moore v. Permanente Medical Group, Inc.*,

10  981 F.2d 443, 446-48 (9th Cir. 1992).  In fact, the Ninth Circuit has made clear that an award of

11  attorneys' fees is permissible even if defendant's removal was "fairly supportable," but wrong as

12  a matter of law.  See *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1106 n. 6 (9th

13  Cir. 2000).

14       The decision to grant fees under § 1447(c) therefore rests in the sound discretion of the trial

15  court.  See *Toumajian v. Frailey*, 135 F.3d 648, 657 (9th Cir. 1998) ("upon remand for lack of

16  subject matter jurisdiction court may require payment of just costs and any actual expenses,

17  including attorney's fees incurred as a result of the removal"); *Gotro v. R&B Realty Group*, 69

18  F.3d 1485, 1487-88 (9th Cir. 1995) (recognizing that the district court has broad discretion to

19  award attorneys' fees incurred as a result of removal under § 1447(c)); *Moore*, 981 F.2d at 447

20  ("Given the wide discretion provided the district court by § 1447(c), we will review an award of

21  attorney's fees under this statute for abuse of discretion").

22       In determining whether to award fees and costs, the court must assess the merits of

23  defendant's removal petition.  See *Moore*, 981 F.2d at 447; see also *Balcorta*, 208 F.3d at 1106,

24  n. 6 ("our case law . . . permit[s] an award of fees when a defendant's removal, while 'fairly

25  supportable,' was wrong as a matter of law"); *Gray v. New York Life Ins. Co.*, 906 F. Supp. 628,

26  634 (N.D. Ala. 1995) ("the decision as to whether to award fees under § 1447(c) turns primarily,

27  
28       [94]Declaration of Thomas Freeman ("Freeman Decl."), ¶ 4.

1  if not solely, on the merit of the removal").

2       Here, the court has found that the removal of Molina's action from state court was untimely
3  as a matter of law.  Under § 1447(c), therefore, the court has the discretion to award fees.  The
4  court notes, however, that the Ninth Circuit has previously declined to address the application of
5  a federal mediation privilege in the removal context.  See *Babasa*, 498 F.3d at 975 n. 1 (declining
6  to decide whether federal mediation privilege applied to a settlement letter prepared for mediation
7  in deciding whether it put defendant on notice of the action's removability); see also *Dusek*, 141
8  Fed. Appx. at 588 n. 2 ("[W]e need not address whether the Ninth Circuit should recognize a
9  federal mediation privilege . . ."). Even if such a privilege exists, moreover, its scope and
10 application are unclear.  See *Folb*, 16 F.Supp.2d at 1179 ("[T]he contours of [ ] a federal privilege
11 need to be fleshed out over time").  Because Lexmark's notice of removal was based on an
12 arguable interpretation of law, the court declines to exercise its discretion to award plaintiff fees
13 and costs.

14

15                               **III.  CONCLUSION**

16      For the foregoing reasons, the court grants plaintiff's motion, and remands the action
17 forthwith to Los Angeles Superior Court.

18

19

20 DATED: September 30, 2008

                                                  MARGARET M. MORROW
                                  UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28